1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

11    Student Doe #2, et al.,                         CASE NO. 2:25-cv-00680-DGE

                          Plaintiff,                  ORDER ON MOTION FOR
12        v.                                          TEMPORARY RESTRAINING
                                                      ORDER (DKT. NO. 2)
13    Kristi Noem, et al.,

14                          Defendant.

15

16                          **I        INTRODUCTION**

17        Plaintiff Doe 2[1] is a Chinese national who completed a master's degree at the University

18    of Illinois Urbana-Champaign and is maintaining her F-1 visa status by working in an Optional

19    Practical Training (OPT) program.  (Dkt. No. 1 at 2.)  Plaintiff Doe 3 is also a Chinese national

20    on an F-1 visa who is working towards completion of her PhD at the University of Illinois

21    _____

22    [1] Both Plaintiffs have indicated that they will file a motion to proceed pseudonymously.  (Dkt.
      No. 1 at 5 n.2.)  By referring to Plaintiff as Doe at this stage, the Court expresses no view on that
23    motion.  During a TRO hearing held on April 24, 2025, the Parties confirmed that Defendants
      are aware of Does' identity and that Plaintiffs have disclosed that information to them, and as
24    such, referring to them as Does in the TRO order would not be an obstacle to compliance.

1   Urbana-Champaign.  (*Id.*)  Both Plaintiffs reside in Redmond, Washington.  (*Id.*)  Both Plaintiffs

2   were arrested on September 21, 2024 due to a domestic dispute, but no criminal charge was filed,

3   and they have no other criminal history.  (*See* Dkt. Nos. 2-2 at 2, 2-3 at 2.)

4           On April 4 and April 8, 2025, respectively, Does 2 and 3 learned through their university

5   that their records within the Student and Exchange Visitor Information System ("SEVIS")

6   maintained by Immigration and Customs Enforcement ("ICE") had been terminated and were no

7   longer in an active status.  (*Id.* at 11–12.)  In both cases, the initial purported reason for

8   terminations indicated in SEVIS was "Otherwise Failing to Maintain Status: Individual identified

9   in criminal records check and/or has had their VISA revoked."  (*Id.*)  Doe 2's visa was later

10  revoked, Doe 3's visa was not.  (*Id.* at 11–12.)

11          Plaintiffs bring claims under the Administrative Procedure Act ("APA") and the Fifth

12  Amendment.  (*Id.* at 14–17.)  Defendants are the Secretary of Homeland Security, the

13  Department of Homeland Security, and the ICE Acting Director (collectively, "Defendants").

14  (*Id.* at 6.)  Plaintiffs move for a Temporary Restraining Order ("TRO") requiring Defendants to

15  restore their SEVIS record and status, and to prevent the Defendants from taking enforcement

16  actions against them based on the termination of their SEVIS records.  (*See* Dkt. No. 2.)

17  Because Plaintiffs are likely to succeed in their argument that Defendants' actions were arbitrary

18  and capricious, and not in accordance with law, the Court will grant the TRO.  *See* 5 U.S.C.

19  § 706(2)(A).

20          This case is related to several other F-1 visa termination cases in this district, including

21  the first-filed case *Doe v. Noem*, No. 2:25-cv-00633-DGE, in which this court granted a TRO.  ---

22  - F.Supp.3d ---, 2025 WL 1141279 (W.D. Wash. April 17, 2025.)  This order applies

23  substantially and builds on the same reasoning as the original *Doe* case.

24

## II    BACKGROUND

### A. The F-1 Visa Program and SEVIS

Pursuant to the Immigration and Nationality Act ("INA"), a foreign student may enter the United States in a nonimmigrant status to complete a course of study at an approved educational institution. 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.2(f). If approved, the State Department will issue a visa allowing the student admission to the United States to pursue their course of study. *See* 22 C.F.R. § 41.61(b)(1). If admitted, DHS may administratively designate the student as an F-1 nonimmigrant classification. 8 C.F.R. § 214.1(a)(2). A key component to admission as an F-1 nonimmigrant student is the presentment of Form I-20, which is "issued in the student's name by a school certified by the Student and Exchange Visitor Program (SEVP) for attendance by F-1 foreign students." 8 C.F.R. § 214.2(f)(1)(i)(A). The F-1 student's Form I-20 is endorsed at the time of entry into the United States and the F-1 student is responsible for "retain[ing] for safekeeping the initial form I-20 or successor form bearing the admission number and any subsequent form I-20 issued to them." 8 C.F.R. § 214.2(f)(1)(ii), (f)(2).

An F-1 student may remain in the United States for the duration of their studies so long as they continue to meet the requirements outlined in the regulations. 8 C.F.R. § 214.2(f)(5)(i) ("Duration of status is defined as the time during which an F–1 student is pursuing a full course of study at an educational institution certified by SEVP for attendance by foreign students"). If a student "fails to maintain a full course of study without the approval of a [Designated School Official ("DSO")] or otherwise fails to maintain status," they must depart the United States immediately or seek reinstatement.[2] 8 C.F.R. § 214.2(f)(5)(iv); *see also* 8 U.S.C. § 1184(a)(1).

---

[2] A student may seek reinstatement by submitting an I-539, Application to Extend/Change Nonimmigrant status to United States Citizenship & Immigration Service ("USCIS") and a Form

Work authorization for F-1 students is governed by 8 C.F.R. § 274.12(b)(6).  The regulation specifies certain classes of noncitizens who are "authorized for employment with a specific employer incident to status or parole" and may work subject to any conditions of their nonimmigrant classification, without additional documentation from DHS.[3]  Pursuant to the regulations, F-1 students may participate in two types of practical training programs: Curricular Practical Training ("CPT") and OPT, which involves post-graduate practical training in the student's major area of study.  *See* 8 C.F.R. § 214.2(f)(10).  In order to participate in OPT, a student must first gain approval from their DSO.  8 C.F.R. §§ 214.2(f)(11)(i).  The student must then apply to USCIS for authorization for OPT employment; a student may not begin the OPT program until the date indicated on the Employment Authorization Document (Form I-766) the student receives from USCIS.  8 C.F.R. §§ 214.2(f)(11)(i)(D).  A student has 14 months to complete the OPT program, unless they receive a 24-month extension for a science, technology, engineering, or mathematics (STEM) degree.  *See* 8 C.F.R. § 214.2(f)(10)(ii)(C).  Once an F-1

_____

I-20 or a successor form indicating a DSO's recommendation for reinstatement.  8 C.F.R. § 214.2(f)(16)(i).  Pursuant to the regulations, a district director "may consider" reinstatement if: (1) student has not been out of status for more than five months at the time of filing or the failure to seek reinstatement within five months was due to exceptional circumstances; (2) student "[d]oes not have a record of repeated or willful violations of DHS regulations; (3) student is pursuing or intending to pursue a full course of study at the school that issued the Form I-20 or successor form; (4) student has not engaged in unauthorized unemployment; (5) student is not deportable pursuant to § 237 of the INA; and (6) USCIS is satisfied the violation of status was beyond the student's control, or the "violation relates to a reduction in the student's course load that would have been within a DSO's power to authorize, and that failure to approve reinstatement would result in extreme hardship to the student."  8 C.F.R.§ 214.2(f)(16)(i)(A)–(F). USCIS's decision to deny reinstatement is unreviewable.  *See* 8 C.F.R. § 214.2(f)(16)(ii).

[3] That includes "[a] nonimmigrant (F–1) student who is in valid nonimmigrant student status and pursuant to 8 C.F.R. 214.2(f)" is seeking (i) on campus employment, part time during the academic year or full time when school is not in session, (iii) CPT programs as authorized by the DSO and I-20, (iv) OPT employment as designated on a form I-766, and (v) a student who is seeking H-1B status and whose F-1 status has been extended in the interim.  *See* 8 C.F.R. §§ 212.2(h); 214.2(f)(5)(vi).  In other words, a student who is maintaining status under 8 C.F.R. § 214.2(f) is eligible for employment consistent with the terms described in that section.

student has completed their course of study and any CPT or OPT, they have sixty days to depart the United States.  8 C.F.R. § 214.2(f)(5)(iv).

A nonimmigrant student's legal status is governed by the F-1 visa system, which is administered by ICE through its Student and Exchange Visitor Program (SEVP).  *Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 175 (3d Cir. 2019).  In turn, SEVIS is an SEVP-managed internet system that tracks and maintains information on nonimmigrant students.  *See* 8 C.F.R. § 214.3(a)(l).  To implement the F-1 visa program, SEVP certifies participating educational institutions, allowing those institutions to issue a Form I-20 in the student's name in SEVIS.[4]  SEVP regulations also govern the termination of F-1 student status in SEVIS.  8 C.F.R. § 214.2(f).  A student may fall out of F-1 status by: (1) failing to meet the regulatory requirements for F-1 student status or (2) via an agency related termination of status.  8 C.F.R. §§ 214.1(d), 214.2(f)(5)(iv).[5]  DHS can terminate an F-1 student's status in three ways: 1) by revoking a previously authorized waiver under 8 U.S.C. § 1182(d)(3) or §1182(d)(4); 2) through the introduction of a private bill in Congress to confer permanent resident status; or 3) if DHS publishes a notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.  8 C.F.R. § 214.1(d).  DHS's ability to terminate an F-1 student's status is limited to the three ways enumerated in § 214.1(d).  *See Jie Fang*, 935 F.3d at 185 n.100.

**B.  Defendants Terminate Plaintiffs' Records in SEVIS**

Doe 2 is a Chinese national who entered the U.S. on a valid F-1 visa and currently resides in Redmond, Washington.  (Dkt. No. 2-2 at 1.)  She graduated from the University of Illinois

---

[4] *Study in the States*, Dep't of Homeland Sec. (last accessed Apr. 16, 2025), https://studyinthestates.dhs.gov/site/about-sevis; 8 C.F.R. § 214.2(f)(1)(i)–(iii).

[5] The regulations detail circumstances under which the visa holder may be considered to fail to maintain status, including unauthorized employment, willful failure to provide truthful information to DHS, or certain qualifying criminal convictions.  8 C.F.R § 214.1(e)–(g).

1    Urbana-Champaign in December 2022 with a master's degree in finance.  (*Id.*)  Since then, she

2    has been working in an OPT program with authorization from DHS through her university, first

3    as a research assistant and then remotely as an accountant with a company based in Tennessee.

4    (*Id.*)  She states that "I have never violated the terms of my nonimmigrant status."  (*Id.*)  Doe 2

5    maintained a 3.7 GPA in her academic program and has been a standout at work, winning an

6    award for their performance last quarter.  (*Id.*)   On April 4, 2025, Doe 2 received an email from

7    her university informing her that her SEVIS status was terminated.  (*Id.*)  The stated reason was

8    "Otherwise Failing to Maintain Status: Individual identified in criminal records check and/or has

9    had their VISA revoked."  (*Id.*)  On April 8, the basis was changed to "other" and on April 9,

10   Doe 2 received an email from the United States Consulate informing her that her visa was

11   terminated.  (*Id.*)  Doe 2 had hoped to continue her studies with an MBA or JD in the United

12   States, but that goal is now in doubt.  (*Id.* at 1–2.)  The stress of this situation has prevented Doe

13   2 from eating and sleeping; she lost 8 pounds in a week and is afraid to leave home.  (*Id.* at 2.)

14   Doe 2 had to leave her job, and she is at risk of losing employer sponsored health insurance,

15   which is especially concerning because she was diagnosed with insulin resistance and needs

16   medication and a glucose monitor.  (*See id.* at 2.)  During the April 24 TRO hearing, Doe 2's

17   counsel stated that her employer will reinstate her at work if a TRO is entered.

18        Doe 3 is also a Chinese national who entered the United States on a valid F-1 visa and is

19   living in Redmond, Washington.  (Dkt. No. 2-3 at 1.)  She too graduated from the University of

20   Illinois Urbana-Champaign, with a master's degree in electrical and computer engineering.  (*Id.*)

21   She has continued in a PhD program at the same university, on track to defend her dissertation

22   and receive her degree later this year.  (*Id.*)  Doe 3 has been a distinguished PhD candidate,

23   receiving the Mavis Future Faculty Fellowship, a merit-based award for candidates with strong

24

potential for tenure-track positions.  (*Id.*)  Doe 3 has also taken advantage of CPT, accepting an offer as a research scientist for Meta in Bellevue, Washington in February 2024.  (*Id.*)  On April 8, 2025 she received an email from the University informing her that her SEVIS record was terminated, with the stated reason being "Otherwise Failing to Maintain Status: Individual identified in criminal records check and/or has had their VISA revoked."  (*Id.*)  Doe 3 has suffered financial harms as a result of the SEVIS termination; she had to leave her job to avoid unauthorized employment, and is no longer earning income, but still has fixed expenses such as rent and a car loan.  (*Id.* at 2.)  The stress of this situation has also harmed her mental health.  (*Id.* at 3.)

During the April 24 TRO hearing, Doe 3's counsel provided additional information with regards to Doe 3's employment and PhD program.  He stated that Doe 3's job with Meta was already scheduled to end in the near term, but Doe 3 had to leave early because of the SEVIS termination.  Further, Doe 3 intended to change to an O-1 visa to pursue new employment in the United States, but now cannot do so while she is out of status—at least not without leaving the country and risking being denied reentry.  *See* 8 U.S.C. § 1258(a).  Finally, while the record is limited on this point, counsel indicated that at least some aspects of Doe 3's PhD program are in person, specifically her dissertation defense.

Does 2 and 3 have one shared interaction with the criminal justice system.  On September 21, 2024, both Doe 2 and Doe 3 were arrested in Los Angeles, CA on suspicion of battery, but neither were charged with any crime.  (Dkt. Nos. 2-2 at 2, 2-3 at 2.)  They have no other criminal history.  (*See id.*)

Plaintiffs initiated this action on April 15, 2025.  (Dkt. No. 1.)  They allege three causes of action under the APA: arbitrary and capricious agency action, action in excess of statutory and

regulatory authority, and action contrary to a constitutional right.  5 U.S.C. §§ 706(2)(A), 706(2)(C), 706(2)(D).  (Dkt. No. 1 at 14–17.)  They further allege a Fifth Amendment Procedural Due Process violation.  (*Id.* at 15.)  Doe 2 expressly does not challenge the revocation of her F-1 visa in this action, only the SEVIS termination.  (*Id.* at 4–5.)  Both Plaintiffs ask this Court to "[v]acate and set aside the DHS's termination of Plaintiffs' SEVIS status" and "[o]rder Defendants to immediately restore Plaintiffs' SEVIS record and status."  (*Id.* at 18.)  They seek a TRO that "(1) enjoin[s] Defendants' decision to terminate Plaintiffs' SEVIS records; and (2) enjoin[s] Defendants from taking enforcement action against Plaintiffs on the basis of those terminations."  (Dkt. No. 2 at 10.)

### III     LEGAL STANDARD

Federal Rule of Civil Procedure 65(b) governs the issuance of a TRO.  "The legal standard for a TRO is substantially identical to the standard for a preliminary injunction." *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 732 (N.D. Cal. 2020).  To obtain injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Generally, a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22.  The moving party has the burden of persuasion.  *Hill v. McDonough*, 547 U.S. 573, 584 (2006).  "The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418 (2009).

1    The Ninth Circuit has also articulated an alternative "sliding scale" approach pursuant to

2    which the first and third *Winter* factors are analyzed on a continuum; under such standard, a

3    weaker showing on the merits, combined with a stronger demonstration on the balancing test,

4    might warrant preliminary injunctive relief, assuming the second and fourth *Winter* elements are

5    met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–1135 (9th Cir. 2011).

6    Under this "sliding scale" method, the movant need only raise "serious questions going to the

7    merits," but the balance of hardships must tip "sharply" in the movant's favor. *Id.* at 1131–1132;

8    *see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).

### IV    JURISDICTION

10    "Section 704 of the APA provides for judicial review of '[a]gency action made

11    reviewable by statute and final agency action for which there is no other adequate remedy in a

12    court.'" *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 952 (9th Cir. 2017)

13    (quoting 5 U.S.C. § 704).  As no statute authorizes judicial review over the termination of SEVIS

14    records, the singular issue here is whether Defendants' termination of Plaintiff's SEVIS record

15    was "final" agency action for which there was no other "adequate remedy." 5 U.S.C. § 704.  *C.f.*

16    *Cabaccang v. U.S. Citizenship & Immigr. Servs.*, 627 F.3d 1313, 1316 (9th Cir. 2010).  For

17    agency action to be deemed final, it must "mark the consummation of the agency's decision-

18    making process" and "the action must be one by which rights or obligations have been

19    determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–

20    178 (1997) (internal quotation marks omitted).

21    As an initial matter, it is apparent that the termination of Plaintiffs' SEVIS records is an

22    agency action that implicates "rights and obligations" and may well result in "legal

23    consequences." *Id.*; *see also Jie Fang*, 935 F.3d at 180.  Next, the action appears to constitute

24

the consummation of the agency's decimating process for two reasons.  First, "there is no

statutory or regulatory requirement that a student seek reinstatement" of student status in SEVIS,

and even if a student attempts to pursue the administrative procedure for SEVIS reinstatement,

there is no "mechanism to review the propriety" of the original termination.  *Jie Fang*, 935 F.3d

at 182; *see* 8 C.F.R § 214.2(f)(16)(ii) ("The adjudicating officer will update SEVIS to reflect

USCIS' decision. If USCIS does not reinstate the student, the student may not appeal the

decision.").  Second, since neither immigration judges nor the BIA have the authority to review

SEVIS termination or a USCIS denial of reinstatement, there is no proceeding in which a student

can contest the agency action at issue here.  *Jie Fang*, 935 F.3d at 185.; *Ghorbani v. I.N.S.*, 686

F.2d 784, 791 (9th Cir.1982); *Tooloee v. I.N.S.*, 722 F.2d 1434, 1438–1439 (9th Cir. 1983).

Thus, the termination of Plaintiffs' F-1 student status in SEVIS was not "of a merely tentative or

interlocutory nature," but rather a unilateral determination with immediate legal consequences

over which Plaintiffs have no ability to seek administrative review.  *Bennett*, 520 U.S. at 177–

178.  Accordingly, the Court finds it has jurisdiction to proceed.  *C.f. Jie Fang*, 935 F.3d at 182

("[t]he order terminating these students' F-1 visas marked the consummation of the agency's

decisionmaking process, and is therefore a final order").

# V    ANALYSIS

## A.  Plaintiffs Are Likely to Succeed in the Argument that Termination of Their SEVIS Records was Unlawful

Under the APA, a court shall "hold unlawful and set aside agency action" that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. § 706(2)(A).  Here, based on the limited record before the Court, Plaintiffs have

demonstrated a likelihood of success on two independent grounds under § 706(2)(A): that

Defendants' termination of their SEVIS records was not in accordance with law, and that it was arbitrary and capricious.[6]

### 1. Not In Accordance with Law

#### i. Agencies Must Follow Their Own Regulations

It is contrary to law for an agency to disregard its own regulations and policies. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003); *Wallace v. Christensen*, 802 F.2d 1539, 1552 n.8 (9th Cir. 1986) (an agency is "bound by its own regulations so long as they remain in force."). As the District of Columbia Circuit has explained:

> In a series of decisions, the Supreme Court has entertained challenges to agency actions that failed to conform to agency regulations. In *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943), the Court held that an agency is bound to the standards by which it professes its action to be judged. In *Accardi,* a case involving a habeas challenge to the denial of suspension of deportation, the Court objected to the agency's 'alleged failure to exercise its own discretion contrary to existing valid regulations.'

*Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 246 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003) (quoting *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268, (1954)) (parallel citation omitted). Moreover, "'a court's duty to enforce an agency regulation, while most evident when compliance with the regulation is mandated by the Constitution or federal law,' embraces as well agency regulations that are not so required." *Id.* at 247 (alterations omitted) (quoting *United States v. Caceres*, 440 U.S. 741, 749 (1979)).

The Ninth Circuit has affirmed that "[p]ursuant to the *Accardi* doctrine, an administrative agency is required to adhere to its own internal operating procedures." *Church of Scientology of California v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990); *see also United States v. Nixon*, 418 U.S. 683, 696 (1974)*; Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U.S. 370,

---

[6] Because the Court finds that Plaintiffs have established likelihood of success on their APA claim, the Court does not reach their Fifth Amendment Due Process claim at this time.

389 (1932).  Courts have framed the obligation for an agency to follow its own regulations as

deriving from § 706(2)(A) or other APA provisions.  *See, e.g., Suncor Energy (U.S.A.), Inc. v.*

*United States Env't Prot. Agency*, 50 F.4th 1339, 1352 (10th Cir. 2022) (holding that EPA action

violated § 706(2)(A) because it ignored the agency's regulatory definition of "facility"); *Kidd v.*

*Mayorkas*, 734 F. Supp. 3d 967, 983–984 (C.D. Cal. 2024) (ICE policy of warrantless "knock

and talk" violated agency's regulations and thus § 706(2)(A)).  Agencies must also adhere to

internal procedures designed to provide protections to individuals.  *Morton v. Ruiz*, 415 U.S. 199,

235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to

follow their own procedures."); *see also Lopez*, 318 F.3d at 247; *Beshir v. Holder*, 853 F.Supp.2d

1, 11 (D.D.C. 2011) (DHS Secretary's discretion to issue procedural rule pausing processing of

adjustment of status applications limited by regulation requiring adjudication in certain

timeframe).

Accordingly, Defendants are bound to follow their own rules and regulations governing

the proper termination of an F-1 student's record in SEVIS.

## ii.  Defendants Failed to Follow Their Own Regulations and Procedures

As discussed *supra*, a student's record in the SEVIS system can be terminated either

because the student fails to maintain status, or when the agency initiates a termination of status.

8 C.F.R. §§ 214.1(d); 214.2(f).  In this instance, both Plaintiffs state that they have maintained

status in their respective programs, and Defendants have introduced no evidence to the contrary.

Agency-initiated termination is governed by 8 C.F.R. § 214.1(d), which enumerates

circumstances that result in termination:

> Within the period of initial admission or extension of stay, the nonimmigrant status of an
> alien shall be terminated by the revocation of a waiver authorized on his or her behalf
> under section 212(d)(3) or (4) of the Act; by the introduction of a private bill to confer

permanent resident status on such alien; or, pursuant to notification in the Federal
Register, on the basis of national security, diplomatic, or public safety reasons.

Defendants do not argue that any of these criteria are present here.

Additionally, each Plaintiff's domestic violence arrest is not a qualifying offense that
could lawfully result in SEVIS termination. DHS's regulations specifically explain what
criminal activity results in failure to maintain status for a nonimmigrant:

> A condition of a nonimmigrant's admission and continued stay in the United States is
> obedience to all laws of United States jurisdictions which prohibit the commission of
> crimes of violence and for which a sentence of more than one year imprisonment may be
> imposed. A nonimmigrant's conviction in a jurisdiction in the United States for a crime
> of violence for which a sentence of more than one year imprisonment may be imposed
> (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain
> status under section 241(a)(1)(C)(i) of the Act.

8 C.F.R. § 214.1(g). Neither Plaintiff has been charged or convicted with any crime, they only
have a single arrest. To the extent that Defendants terminated Plaintiffs' SEVIS records merely
because their names appeared in a criminal records check, that is inconsistent with their own
regulation, which renders the decision invalid under § 706(2)(A). *See supra.*

As to Doe 2, her visa was revoked after her SEVIS record was terminated (*see* Dkt. No.
2-2 at 1), but this does not retroactively make the SEVIS termination lawful. Recall the
distinctions between the F-1 visa and record in the SEVIS system. *See supra,* Section II(A). The
former is necessary for admission to the United States, the latter indicates maintenance of lawful
status. 8 C.F.R. §§ 214.2(f)(1); 214.2(f)(5). Congress has granted the Secretary of State and
consular officers broad discretion to revoke nonimmigrant visas, and such a determination can
only be challenged in removal proceedings. 8 U.S.C. § 1201(i). But the State Department's own
internal policy directs consular officers that "[u]nder no circumstances should you revoke a visa

1    when the individual is in the United States." *See* 9 FAM 403.11-3(B).[7]  Since Doe 2 was already

2    lawfully admitted to the United States, her admissibility should have no bearing on her continued

3    lawful presence, and Defendants have identified no authority that permits them to terminate a

4    SEVIS record on the basis of a visa revocation.  ICE's own internal policy guidance confirms

5    that "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS

6    record." *Policy Guidance 1004-01—Visa Revocations*.[8]  Likewise, State Department guidance

7    confirms that after a nonimmigrant exchange student visa is revoked, "the visa is no longer valid

8    for *future* travel to the United States" but only "*after* the individual's departure from the United

9    States, sponsors should terminate his or her program status in SEVIS." *Guidance Directive*

10   *2016-03 9 FAM 403.11-3 – Visa Revocation*.[9]  Thus, the revocation of Doe 2's F-1 visa does not

11   serve as a ground for the SEVIS termination.

12        Additionally, Defendants indicated at the April 25, 2025 hearing they are unable to state

13   whether termination of the SEVIS record invalidates a student's nonimmigrant status.  This

14   position is inconsistent with the regulatory scheme.  First, the SEVIS system provides a school

15   the means to report a student's compliance with requirements for maintaining F-1 nonimmigrant

16   status (as indicated on form I-20).  *See* 8 C.F.R. §§ 214.2(f)(1)(iii); 214.3.  If a SEVIS record is

17   terminated, the school can no longer report the student's compliance; DHS advises that "[o]nce

18   the student has been terminated you will not be able to take any action on this student or print the

19

20   [7] U.S. State Department, Foreign Affairs Manual (last updated Oct. 2, 2024)
     https://fam.state.gov/fam/09FAM/09FAM040311.html.

21   [8] *Policy Guidance 1004-01—Visa Revocations*, U.S. Immigration and Customs Enforcement, 3,
     (June 7, 2010) https://www.ice.gov/doclib/sevis/pdf/visa_revocations_1004_04.pdf.

22   [9] *Guidance Directive 2016-03 9 FAM 403.11-3 – Visa Revocation*, U.S. Dep't of State Bureau of
23   Educational and Cultural Affairs Private Sector Exchange, 1–2, (Sept. 2, 2016)
     https://j1visa.state.gov/wp-content/uploads/2019/05/2016-
24   03_GD_Visa_Revocation_FINAL_Sept_2016.pdf.

student's record without requesting reinstatement."[10]  Thus, the school and the student have no way of establishing the student remains in valid nonimmigrant status.  Second, the SEVIS record termination means "a student loses all on- and/or off-campus employment authorization."[11]  But cancellation of employment authorization can only mean that a student has failed to maintain status and therefore is no longer in nonimmigrant status.  *See* 8 C.F.R. § 214.2(f)(9)(ii)(A) ("The employment authorization is automatically terminated whenever the student fails to maintain status."); 8 C.F.R. § 274a.12(b)(6) (identifying that a nonimmigrant F-1 student who is in valid nonimmigrant status is authorized for employment).  Thus, it is inconsistent for the government to acknowledge it terminated Plaintiffs' SEVIS records while failing to acknowledge it has terminated each Plaintiff's lawful nonimmigrant status.  To the extent the Government admits to terminating the SEVIS records of students who have properly maintained their status, that would be a misuse of the system and contrary to the relevant regulations.

Finally, during the April 24 hearing, counsel for Defendants invoked 8 U.S.C. § 1372 as providing authority for the termination of Plaintiffs' SEVIS records.  That statute confers authority to *create* the SEVIS system but says nothing about termination of a student's record in the system.  Contrastingly, 8 C.F.R. § 214.1(d) enumerates the sole grounds under which DHS may initiate the termination of F-1 student's record in SEVIS.  *See Jie Fang*, 935 F.3d at 185 n.100.  When one section of a statutory scheme passes specifically upon the question at hand and the other section is silent, Courts understand the specific to govern the general.  *See RadLAX*

---

[10] U.S. Dep't Homeland Sec., *Study in the States: Complete Program* (July 17, 2024), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/complete-program.

[11] U.S. Dep't Homeland Security*, SEVIS Help Hub: Terminate A Student* (Nov. 7, 2024.) https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student.

*Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Here, 8 C.F.R. § 214.1(d) speaks specifically to when a SEVIS record may be terminated, 8 U.S.C. § 1372 does not.[12]

Accordingly, termination of Plaintiffs' SEVIS records because of their DV arrest appears inconsistent with agency regulations and procedures, which renders the decision invalid. *Nat'l Ass'n of Home Builders*, 340 F.3d at 852; *Wallace*, 802 F.2d at 1552 n.8. Because Defendants' termination of Plaintiffs' SEVIS records were—based on the limited information currently available—not authorized by and violated their own regulations, Plaintiffs are likely to succeed in the argument that the agency action is not in accordance with law under § 706(2)(A).

2. <u>Arbitrary and Capricious for Lack of Explanation</u>

Agency action is considered arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As the Ninth Circuit has explained, the "critical factor in *Motor Vehicle* was that the agency 'submitted no reasons at all' for its decision." *McFarland v. Kempthorne*, 545 F.3d 1106, 1113 (9th Cir. 2008) (citing *Motor Vehicle*, 463 U.S. at 50). The *Motor Vehicle* standard has been applied to review individualized agency decisions as well as agency rules. *See, e.g.*, *Does 1 through 16 v. U.S. Dep't of Homeland Sec.*, 843 F. App'x 849, 852 (9th Cir. 2021); *McNeely v. United States Dep't of Lab.*, 720 F. App'x 825, 827 (9th Cir. 2017).

---

[12] When asked during the hearing if there is a specific provision in 8 U.S.C. § 1372 that provides authority for the termination of a student's SEVIS record, Defendants were unable to provide one.

In this instance, Defendant has failed to meet "the general administrative-law requirement that an agency 'articulate a satisfactory explanation for its action.'"  *Hernandez v. Garland*, 52 F.4th 757, 768 (9th Cir. 2022) (quoting *State Farm*, 463 U.S. at 43).  Indeed, Defendant has failed to suggest any lawful grounds as to why its action here is lawful under the APA.  *Motor Vehicle*, 463 U.S. at 50.  Defendants' submission that they "do not concede that Doe has demonstrated a likelihood of success on the merits on his APA claim" but cannot defend it because "Defendants have not completed [factfinding] efforts in time to respond to [Plaintiffs'] motion" is inadequate under governing law.  (Dkt. No. 15 at 12.)  *C.f. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020).[13]  The Court declines to "deny [Plaintiffs'] motion even in the absence of this factual information related to the APA claim." (Dkt. No. 15 at 12.)  Indeed, Defendants' failure to provide a single plausibly lawful explanation for its action—an explanation reasonably grounded somewhere in the statutory scheme—is the exact circumstance contemplated by the arbitrary and capricious standard.  *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (en banc) ("[*Motor Vehicle*] teaches that even when reversing a policy after an election, an agency may not simply [change courses] without a reasoned explanation.").

Accordingly, Plaintiffs are also likely to prevail on the claim that the agency action is arbitrary and capricious for failing to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle*, 463 U.S. at 43.

---

[13] An agency need not consider every conceivable alternative, but when it is "not writing on a blank slate" it must consider the impact of its actions on vested reliance interests, especially in the immigration context, where individuals make "time-bounded commitment[s], to allow them to, say, graduate from their course of study."  *Regents*, 591 U.S. at 32–33.

**B.  Remaining TRO Factors Favor Plaintiffs**

1.  <u>Plaintiffs Face Irreparable Harm</u>

As a result of Defendants' actions, Does 2 and 3 are facing several types of harm that interact with one another: loss of employment, threat of removal, and resulting emotional harms. Doe 2 faces unique harms related to her medical situation, and Doe 3 faces interruption of her PhD program.  Taken together, the Court finds that these harms are sufficient to constitute irreparable harm for the purposes of a TRO.

First, both Doe 2 and Doe 3 have had to stop work at their jobs as a result of losing work authorization.  (Dkt. No. 2-2 at 2, 2-3 at 2.)  Second, while Defendants have not yet placed Plaintiffs in removal proceedings, they face the prospect of detention, removal proceedings, and ultimately removal because termination of their SEVIS records indicates that Plaintiffs are not maintaining status in their respective programs.  *See* 8 U.S.C. §§ 1227(a)(1)(B); 1227(a)(1)(C)(i).  Plaintiffs' fears are not speculative, as DHS's own public-facing guidance states that a person whose SEVIS record is terminated faces the following consequences:

- Student loses all on- and/or off-campus employment authorization.

- Student cannot re-enter the United States on the terminated SEVIS record.

- Immigration and Customs Enforcement (ICE) agents may investigate to confirm the departure of the student.

- Any associated F-2 or M-2 dependent records are terminated.[14]

Importantly, as indicated above, termination revokes all employment authorization and provides ICE agents a basis to investigate a student's departure, which could only mean the

---

[14] *See* Dep't Homeland Security, *supra* note 11.

student no longer maintains lawful status in the United States otherwise why the need to confirm their departure.

Turning now to examine the harms Plaintiffs face in more detail, the Court begins with employment loss and emotional distress.  Employment loss, standing alone, is not typically regarded as irreparable harm, particularly when it can be remedied by back pay.  *Sampson v. Murray*, 415 U.S. 61, 90–92 (1974).  But there are cases where loss of employment "together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found."  *Id.* at 92 n.68.  The Ninth Circuit has recognized that this criterion is satisfied when loss of employment results in "non-monetary deprivation," including reassignment to an inferior position, or "the consequent emotional stress, depression and reduced sense of well-being" resulting from wrongful discharge.  *Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, 840 F.2d 701, 709 (9th Cir. 1988); *see also Heineke v. Santa Clara Univ.*, 736 F. App'x 622, 624 (9th Cir. 2018) (rejecting "a per se rule for all employment cases—that reputational damage, lost opportunity, and emotional distress caused by a suspension or termination cannot constitute irreparable harm.")

Moreover, in the immigration context, multiple courts have held that loss of or delay in obtaining employment authorization is an irreparable harm.  *See Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 968 (D. Md. 2020), *order dissolved sub nom. Casa de Maryland, Inc. v. Mayorkas*, No. 8:20-CV-2118-PX, 2023 WL 3547497 (D. Md. May 18, 2023) (a delay in an asylum seeker obtaining work authorization is an irreparable harm because "every additional day these individuals wait will visit[] on them crippling dependence on the charity and good will of others"); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y. 2018), *vacated and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1

(2020) (finding that if the DACA program were terminated, resulting loss of work authorization for DACA recipients would be an irreparable harm). When continued work and lawful immigration status are interlinked, the ordinary harms of losing a job (which may not be irreparable standing alone) are heightened. *See e.g., Karakozova v. Univ. of Pittsburgh*, No. 09CV0458, 2009 WL 1652469, at *4 (W.D. Pa. June 11, 2009) (holding that plaintiff, a research assistant who alleged her position was terminated on a discriminatory basis, could show irreparable harm from loss of position because she could lose her H-1B visa and have to leave the country voluntarily or by removal, with no certainty of alternative relief).

Here, where Plaintiffs' loss of employment is tied to sudden, unexpected, and likely unlawful loss of immigration status (*see supra*), they have provided evidence that their emotional and reputational harms go above and beyond the ordinary and are sufficient for a showing of irreparable harm. Doe 2 has suffered anxiety to the point that she is having difficulty eating and sleeping and has lost 8 pounds in a week. (Dkt. No. 2-2 at 2.) She fears ICE agents knocking at her door and is afraid to leave her home. (*Id.*) Doe 3 had unique and specialized work at Meta where she worked on "model prediction performance and system efficiency, and monitoring model behavior," but she had to resign her position early, and now has no cash flow to meet expenses. (Dkt. No. 2-3 at 2.) She too is suffering anxiety and is afraid to leave her home. (*Id.*) Accordingly, this case bears a stronger similarity to instances where courts have found that emotional harm constitutes irreparable harm than to "run of the mill" cases. *See, e.g., EEOC v. Chrysler Corp.*, 546 F. Supp. 54, 70 (E.D. Mich. 1982); *Shapiro v. Cadman Towers, Inc.*, 844 F. Supp. 116, 122 (E.D.N.Y. 1994); *Oshiver v. Court of Common Pleas*, 469 F.Supp. 645, 653 (E.D. Pa. 1979). Based on the available record, Doe 2 will be able to return to her existing work if a TRO is entered, and Doe 3 will not—but Doe 3 faces the additional harm of being unable to

1    change to an O-1 visa and seek new employment absent injunctive relief.  And in this case,

2    Plaintiffs' monetary harms may in fact be irreparable, because the APA does not waive the

3    United States' sovereign immunity as to money damages.  *See Oruganti, v. Noem et al*, No. 2:25-

4    CV-00409-ALM-EPD, 2025 WL 1144560, at *4 (S.D. Ohio Apr. 18, 2025) ("Although this

5    harm is economic in nature, it is irreparable because money damages are likely not available

6    when this litigation concludes.").

7          As to Doe 2, loss of her employment caused additional harms, because she risks losing

8    her employment-based health insurance, and she suffers from insulin resistance.  (Dkt. No. 2-2 at

9    2.)  She needs to see a doctor regularly and needs prescription medication (Metformin) and a

10   glucose sensor, which are cost prohibitive without insurance.  (*See id.*)  The loss of health

11   insurance can be an irreparable harm.  *See Cabral v. Olsten Corp.*, 843 F. Supp. 701, 703 (M.D.

12   Fla. 1994) (collecting cases); *Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 16

13   (D.D.C. 2002) ("The loss of health insurance benefits—particularly for those who are

14   unemployed—constitutes irreparable harm for purposes of a preliminary injunction.")  Entry of a

15   TRO would remedy these harms, as Doe 2 has indicated that her employer will allow her to

16   resume work, and thereby maintain her health insurance, if her visa status is reinstated.

17         Further, as to Doe 3, the Court considers the prospect that she may not be able to

18   complete her PhD program if removed.  While removal is not by itself an irreparable harm, *see*

19   *Nken*, 556 U.S. at 430, in this case, the ordinary harms of removal would be compounded

20   because it would hinder or eliminate Doe 3's ability to complete her PhD program, which she is

21   on track to do in less than a year.  In numerous similar cases regarding F-1 visas around the

22   nation in recent days, courts have concluded that "[t]he loss of timely academic process alone is

23   sufficient to establish irreparable harm."  *Isserdasani v. Noem*, No. 25-CV-283-WMC, 2025 WL

24

1118626 (W.D. Wis. Apr. 15, 2025); *see also Liu v. Noem*, No. 25-cv-133-SE, op. at 4 (D.N.H. April 10, 2025); *see also B K v. Noem*, No. 1:25-CV-419, 2025 WL 1171572 (W.D. Mich. Apr. 23, 2025) ("The loss of timely academic progress, whether such progress is accomplished in preparing a dissertation or gaining practical work experience, is simply not compensable by money damages"); *Doe, v. Noem*, No. 3:25-CV-00023, 2025 WL 1161386, *6 (W.D. Va. Apr. 21, 2025); *Yang v. Noem*, No. 25-CV-292-WMC, 2025 WL 1166521, *4 (W.D. Wis. Apr. 22, 2025); *Ratsantiboon v. Noem*, No. 25-CV-01315 (JMB/JFD), 2025 WL 1118645, *2 (D. Minn. Apr. 15, 2025); *Patel v. Bondi*, No. 1:25-CV-00103, 2025 WL 1158708, *2 (W.D. Pa. Apr. 21, 2025); *Saxena v. Noem*, No. 5:25-CV-05035-KES, 2025 WL 1149498, *2 (D.S.D. Apr. 18, 2025); *Chen v. Noem*, No. 25-CV-03292-SI, 2025 WL 1150697, *5 (N.D. Cal. Apr. 18, 2025). Defendants suggest that Doe 3 could merely transfer her credits to another institution. (Dkt. No. 15 at 10.) But doctoral programs typically involve supervision of the doctoral candidate by an adviser with specialized knowledge and reputation in the field, so the inability to complete a doctoral program due to status termination and removal cannot necessarily be remedied with re-starting another program at a different time and place. *See Chen v. Noem et al*, No. 1:25-CV-00733-TWP-MG, 2025 WL 1163653, at *11 (S.D. Ind. Apr. 21, 2025) (adopting same reasoning from *Doe*, 2025 WL 1141279 at *8). Though the record is very limited, Doe 3 has indicated that at least some aspects of her PhD program are in person, specifically her dissertation defense. If she were removed absent entry of a TRO, there is no guarantee she would be able to complete her program.

Considering these harms in their totality, Plaintiffs have sufficiently demonstrated irreparable harm at this early stage, but the issue will be reexamined at the preliminary injunction stage.

2.  <u>There is a Public Interest in Enforcement of Valid Regulations, and Balance of Equities Favor Plaintiff</u>

"When the government is a party, the balance of equities and the public interest factors merge." *Nken*, 556 U.S. at 435.  The public has a vested interest in a federal government that follows its own regulations.  As one court framed it: "the public has a strong interest in having a [government] that conducts itself fairly and according to its stated regulations and policies." *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995); *see also Eight N. Indian Pueblos Council, Inc. v. Kempthorne*, No. CV 06-745 WJ/ACT, 2006 WL 8443876, *5 (D.N.M. Sept. 15, 2006) ("It is in the public interest that federal agencies comply with their own policies and with federal statutes.").  Here, Defendants assert that the public interest factors tip in their favor because the "public interest lies in the Executive's ability to enforce U.S. immigration laws." (Dkt. No. 15 at 12.)  However, Defendants have provided *no indication* that they complied with the relevant statutory scheme to "enforce U.S. immigration laws" in this case.  (*Id.*) Accordingly, this is a set of circumstances where the government and its decision-making processes will be best served by judicial review of a decision—and maintenance of the status quo during that review—that appears both unlawful and likely to cause Plaintiffs irreparable harm. Moreover, Defendants have not put forth evidence of how a TRO would cause them injury or harm.  For these reasons, the Court determines that the balance of the equities and public interest factors tip sharply in Plaintiffs' favor.

Finally, the Court addresses Defendant's argument that Plaintiffs are "not only seeking to preserve the status quo on a temporary basis" but is rather requesting "an order compelling the defendants to change the status quo" because "they seek emergency restoration of a record that has already been marked as terminated." (Dkt. No. 15 at 9.)  Courts have long held that the "status quo ante litem" for the purposes of considering a temporary restraining order or

preliminary injunction "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963). An interpretation of "status quo as the moment before filing a lawsuit but after alleged misconduct began "would lead to absurd situations, in which plaintiffs could never bring suit once infringing conduct had begun." *Id*.

This standard has been applied to government action as well as private disputes. *See, e.g., Doe #1 v. Trump*, 957 F.3d 1050, 1068–1069 (9th Cir. 2020); *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, *13 (N.D. Cal. Mar. 1, 2019). For example, in *S.A.*, the court concluded that the status quo ante litem was the point before DHS stopped processing conditionally approved beneficiaries under a dual refugee/parole program. *See S.A.,* 2019 WL 990680, at *13. Accordingly, the court vacated DHS's decision to mass-rescind conditional approvals for 2,714 beneficiaries pending a final determination on the merits because that maintained the status quo ante litem. *Id*. at *17. Similarly, in this case, the "legally relevant relationship between the parties before the controversy arose," describes the state of affairs *prior* to the termination of Plaintiff's SEVIS record. *Ariz. Dream Act Coalition v. Brewer*, 757 F. 3d 1053, 1060–1061 (9th Cir. 2014). Accordingly, Defendant's argument that "the relief Doe seeks is not a prohibitory injunction to maintain the status quo" is frustrated by decades of Ninth Circuit caselaw. (Dkt. No. 15 at 2.)

Finally, Defendant advances a confused argument that posits Plaintiff seeks "a final judgement on the merits" because a TRO is part of the final relief outlined in his complaint. (Dkt. No. 15 at 2.) Defendants are correct that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *University of Texas v.*

1   *Camenisch*, 451 U.S. 390, 395 (1981).  But what the *Camenisch* court was communicating was

2   that findings of fact and conclusions of law made by a court in a preliminary injunction or TRO

3   posture are preliminary and do not bind the court at the trial on the merits.  *Id*. at 395–398.  Thus,

4   it is not appropriate to enter a *final judgement* at a TRO stage.  *Id*.  That is not what the Court is

5   doing here.  As the *S.A.* court emphasized, "nothing in *Camenisch* holds that the scope of a

6   preliminary injunction cannot overlap with the relief requested for an eventual final judgment."

7   S.*A*, 2019 WL 990680, at *16 n.59.  Here, as in *S.A.*, the order makes no final findings on the

8   merits and merely returns the parties to the status quo ante litem.

9   **C. The Court Will Not Require a Bond**

10   Under Federal Rule of Civil Procedure 65(c), in granting a PI or TRO, the court must

11   require a movant to pay security "in an amount that the court considers proper to pay the costs

12   and damages sustained by any party found to have been wrongfully enjoined or restrained."  The

13   Ninth Circuit has held that "[d]espite the seemingly mandatory language, Rule 65(c) invests the

14   district court with discretion as to the amount of security required, *if any.*" *Johnson v. Couturier*,

15   572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir.

16   2003)) (cleaned up).  "In particular, '[t]he district court may dispense with the filing of a bond

17   when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or

18   her conduct.'"  *Id.* (quoting *Jorgensen,* 320 F.3d at 919).  Here, Defendants request that the

19   Court impose a bond "in an amount the Court determines to be appropriate."  (Dkt. No. 15 at 13.)

20   Defendants do not account for any costs they allege they will face if the TRO is issued

21   erroneously, and the Court perceives none.  Here, Defendants will face no cost from Plaintiffs

22   resuming their work as they did before their SEVIS records were terminated, and negligible or

23   zero cost from restoring their SEVIS statuses to active.  Plaintiffs' only criminal history is the

24

DV arrest for which they were not even charged, let alone convicted, and they pose little if any risk to the public.  The Court therefore exercises its discretion to waive the bond requirement.

## VI    CONCLUSION

Accordingly, it is ORDERED that Plaintiffs' Motion for a Temporary Restraining Order (Dkt. No. 2) is GRANTED.  Defendants are ENJOINED for a period of fourteen days from the date of this order, as follows:

      1) Defendants shall restore Plaintiffs' F-1 student record and I-20 in the Student and Exchange Visitor Information System (SEVIS);

      2) Defendants shall set aside the F-1 student record and I-20 terminations, on or about April 4 and April 8, 2025, as to each Plaintiff;

      3) Defendants shall not terminate Plaintiffs' student records and I-20 in SEVIS absent a valid ground as set forth in 8 C.F.R. §§ 214.1(d)–(g); 214.2(f).

      4) Defendants are prohibited from detaining or transferring Plaintiffs out of this Court's jurisdiction, or ordering the detention or transfer of Plaintiffs out of this Court's jurisdiction, as a result of the termination of their F-1 student records or I-20 in SEVIS on or about April 4 and April 8, 2025; and

      5) Defendants are prohibited from initiating removal proceedings against or removing Plaintiffs on the basis of the April 4 and April 8, 2025 terminations of their F-1 student records or I-20 in SEVIS.

It is furthered ORDERED that the security requirement of Rule 65(c) is waived.

Dated this 25th day of April, 2025.



David G. Estudillo

1                                            United States District Judge

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24